UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| LUCRETIA VELVET HENRY, | CIV. NO. 20-00070 LEK-KJM |
| Plaintiff, | |
| vs. | |
| DENIS McDONOUGH, SECRETARY OF VETERANS AFFAIRS (GOVERNMENT AGENCY), | |
| Defendant. | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On April 21, 2021, Defendant Denis McDonough, Secretary of Veterans Affairs ("Defendant"), filed his Motion for Summary Judgment ("Motion"). [Dkt. no. 52.] The Motion seeks summary judgment in favor of Defendant as to all claims in pro se Plaintiff Lucretia Velvet Henry's ("Henry") Amended Complaint for Employment Discrimination ("Amended Complaint"), [filed 6/19/20 (dkt. no. 14)]. The Motion has been considered as a nonhearing matter, pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules"). On August 5, 2021, an entering order was issued informing the parties of this Court's rulings on the Motion. [Dkt. no. 64.] The instant Order supersedes that entering order. For the reasons set forth

below, Defendant's Motion is granted, and summary judgment is granted in favor of Defendant's as to all of Henry's claims.

## BACKGROUND

Henry brings discrimination and retaliation claims, alleging disparate treatment and a hostile work environment, pursuant to: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*; and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112, *et seq.*  Henry was employed by the Department of Veterans Affairs ("VA") Pacific Island Health Care System in Honolulu, Hawai`i ("PIHCS"), beginning in 2004, and during the period relevant to this case, she was a Health System Specialist, GS-9.  [Amended Complaint at PageID #: 227, 230.] Henry asserts she is a part of a number of protected classes. These include: she is a black woman; she filed at least three internal grievances or equal employment opportunity ("EEO") complaints; and she has disabilities, which she alleges developed because of the hostile work environment she experienced at work.  [Def.'s Concise Statement of Facts in Supp. of Def.'s Motion for Summary Judgment ("Def.'s CSOF"), filed 4/21/21 (dkt. no. 53), Decl. of Miles Miyamoto ("Miyamoto Decl."), Exh. G (excerpt of trans. of 12/7/17 examination of Henry by EEO Investigator James Harding ("Henry Trans.")) at 4-

2

7.]  Henry states her disabilities are "anxiety and adjustment disorders due to the hostile work environment."  [Mem. in Opp., filed 5/17/21 (dkt. no. 57), at 1  (citing Mem. in Opp., Exh. D (Henry's records form TriWest Healthcare Alliance Veterans Choice Program)).]  According to Henry, she "was the only African American (dark-skinned) female veteran over 50 years old diagnosed with anxiety and adjustment disorder disabilities in her office."  [Mem. in Opp. at 4.]

Henry worked in the PIHCS Medical Staff Office ("MSO") from January 2009.  See Miyamoto Decl., Exh. G (Henry Trans.) at 4; Def.'s CSOF, Decl. of Asomuamua Amina ("Amina Decl.") at ¶ 4.[1] The MSO "ensure[s] that the VA's medical providers maintain their credentials and privileges," which are necessary for the providers to continue their practice at the facility.  [Def.'s CSOF, Decl. of Kathryn Ryder, M.D. ("Ryder Decl.") at ¶ 4.[2]]  The MSO credentialing officers "identify[] the medical providers whose credentials [a]re expiring soon by using the Vetpro program" and "start the credentialing renewals process for the

---

[1] Asomuamua Amina ("Amina") is the Medical Staff Coordinator, at GS-11 position, in the MSO.  She also held that position in 2016 and 2017.  [Amina Decl. at ¶¶ 1-2.]

[2] In 2016 and 2017, Dr. Ryder was the PIHCS Deputy Chief of Staff.  [Amina Decl. at ¶ 2.]  During that period, Chief of Staff William Dubbs, M.D., was Amina's supervisor, but if he was out of the office, Dr. Ryder was Amina's supervisor.  [Id. at ¶ 3.]

medical providers." [Id. at ¶¶ 5-6.]  Amina was the lead
credentialing officer in the MSO during the relevant period,
[Amina Decl. at ¶ 6,] and Henry was also a credentialing
officer, [Ryder Decl. at ¶ 7].

In late 2015, there were four employees in the MSO:
Henry; Amina; Irasema Duarte ("Duarte"), a Medical Program
Support Specialist, GS-6; and Santina Wahl ("Wahl"), also a
Medical Program Support Specialist, GS-6.  The MSO's office was
changed, and the four employees were required to share the same
small room.  Prior to that point, Amina and Henry each had her
own office.  [Amina Decl. at ¶¶ 7-8.]  Amina is female whose
race is mixed Polynesian and European.  [Id. at ¶ 25.]  Wahl is
a white female whose race is Italian.  She is also considered
disabled and has prior EEO activity.  [Def.'s CSOF, Decl. of
Santina Wahl ("Wahl Decl.") at ¶ 19.]  Duarte is female whose
race is Puerto Rican.  [Def.'s CSOF, Decl. of Irasema Duarte
("Duarte Decl.") at ¶ 19.]

## I.   Background Relevant to Non-Selection Claims

In 2016, the Hawai`i VA office posted a vacancy
announcement for two Program Specialist, GS-11, positions in the
Managed Care Department.  [Def.'s CSOF, Decl. of April Seghorn

("Seghorn Decl."), at ¶¶ 1-2, 4;[3] Seghorn Decl., Exh. A (Position Description).]  Seghorn selected Haywood Pittman ("Pittman") for the first position as a non-competitive appointment.  Pittman was a participant in the Graduate Health Administrative Training Program ("GHATP"), which required the PIHCS to offer him an available position at the end the one-year program.  The Facility Director instructed Seghorn to consider Pittman for one of the Program Specialist positions.  Pittman had already worked closely with the Managed Care Department for many months,[4] and Seghorn thought he was an excellent candidate for the position. She reviewed his resume and spoke with him, and they agreed he would take the position.  [Seghorn Decl. at ¶ 7.]

For the second Program Specialist position, Seghorn appointed a three-person selection panel to conduct interviews. The panel members were Pittman, Kristin Nakasato ("Nakasato"),[5]

---

[3] April Seghorn is the PIHCS Associate Chief Nurse of the Care in the Community Department, which was previously called the Managed Care Department.  She also held that position in 2016.  [Seghorn Decl. at ¶¶ 1-2.]

[4] One of Pittman's department rotations during the GHATP was with the Managed Care Department.  In addition, he spent considerable time with the Managed Care Department in connection with his project for the GHATP.  [Def.'s CSOF, Decl. of Haywood Pittman ("Pittman Decl.") at ¶¶ 7-8.]

[5] In 2016, Nakasato was a Health Systems Specialist in Dr. Dubbs's office.  Nakasato reported to Dr. Ryder.  [Def.'s CSOF, Decl. of Kristin Nakasato ("Nakasato Decl.") at ¶ 2.]

5

and Joseph Palumbo ("Palumbo").  Palumbo became unavailable
after the first day of interviews, and Seghorn appointed Leolani
Ching ("Ching") to replace him.[6]  [Id. at ¶ 8.]  Seghorn trusted
the panel members' judgment, and she "put all the weight on
their top recommendations."  [Id. at ¶ 11.]  Seghorn provided
the panel with the questions to ask each of the candidates who
were interviewed, as well as the matrix to use for ranking the
candidates.[7]  [Id. at ¶ 10.]  In addition to the matrix, the
panel also gave the applicants scores based on their prior
experience and professionalism.  [Pittman Decl. at ¶ 13.]

        Seghorn's usual practice was to "glance over" each of
the candidates' resumes and ranking sheets, and she recalls
looking at Henry's resume and scoring sheets.  [Seghorn Decl. at
¶ 12.]  Seghorn also recalls that Henry was not among the top
five candidates.[8]  [Id.]  The panel recommended their top two

_____

    [6] Ching states she was unavailable on the first day of
interviews, and therefore Palumbo served in her place.  [Def.'s
CSOF, Decl. of Leolani Ching ("Ching Decl.") at ¶ 3.]

    [7] The panel members confirmed that the applicants were asked
the same questions during the interview, and that the selection
panel scored the applicants using a given rubric/matrix.
[Pittman Decl. at ¶ 13; Nakasato Decl. at ¶¶ 5-6; Ching Decl. at
¶ 4.]

    [8] Pittman states he did not rank Henry among his top five
candidates.  [Pittman Decl. at ¶ 17.]  Nakasato rated Henry
"high in [her] list of candidates," but Nakasato acknowledged
that, when all of the panel members' scores were compiled, Henry
"was not in the top group of candidates."  [Nakasato Decl. at
¶ 8.]

candidates - Tara Gonzalez ("Gonzalez") and Mary Jane Jacinto ("Jacinto") - to Seghorn.  Seghorn also spoke with the panel about the candidate who was rated third - Lawrence DeVoto ("DeVoto").  Id. at ¶ 13; see also Pittman Decl., Exh. B (scoring sheets for Henry, Gonzalez, Jacinto, and DeVoto); Nakasato Decl., Exh. C (same).  Seghorn met with Gonzalez and Jacinto and ultimately selected Jacinto for the position. [Seghorn Decl. at ¶ 14.]

Seghorn, who is a Caucasian female, states "[c]onsiderations of any person's age, race, color, gender, prior EEO activity, or stated disabilities played absolutely no role in [her] selection."  [Seghorn Decl. at ¶¶ 15-16.]  Pittman - who is a black, African American male - and Nakasato - who is a Japanese and Portuguese woman - did not consider Henry's age, gender, race, or color during the selection process.  They were not aware of Henry's prior EEO activity nor Henry's disability during the selection process, and thus they did not consider them.  [Pittman Decl. at ¶ 18; Nakasato Decl. at ¶¶ 10-11, 23.] Ching did not participate in Henry's interview, [Ching Decl. at ¶ 6,] but she states she "did not consider any applicant's age, race, color, gender, prior EEO activity or disability" in the selection process, [id. at ¶ 7].  Ching is a Hawaiian, Chinese, and white female.  [Id. at ¶ 8.]  Pittman states he would have been "sensitive to any prohibited discrimination that influenced

7

a selection process because [he him]self [is] in a protected class," but he did not observe any indication of discrimination in the Program Specialist selection process.  [Pittman Decl. at ¶¶ 19-20.]

Henry argues the fact that Seghorn did not interview or meet with her before Seghorn selected a candidate for each Program Specialist position was a violation of the Agreement Between Department of Veterans Affairs Medical & Regional Office Center Honolulu Hawai`i and Service Employees International Union, Local 556, AFL-CIO ("VAMROC Union Agreement") because Henry was "a 100% disabled veteran applicant."  [Mem. in Opp. at 2 (citing Exhibit F).[9]]  According to Henry, the VAMROC Union Agreement required an internal selection from qualified candidates before selection of a candidate who was not a VA employee, and Henry "was referred by HR and thereby qualified." [Id. (citing Exhibit I).]  The 1996-1998 version of the VAMROC Union Agreement states:

> Management will give preference over outside applicants to all interested promotion eligibles

---

[9] Exhibit F includes a personnel form noting Henry is entitled to "Veterans Preference for RIF."  [Mem. in Opp., Exh. F at PageID #: 4255 (Henry's Notification of Personnel Action (Standard Form 50), effective 3/6/16).]  Exhibit F also includes what appears to be an excerpt of the VAMROC Union Agreement.  See id. at PageID #: 4247 (Art. IX, § 4 ("The selecting official will interview either personally or by telephone all available VAMROC Honolulu candidates who were certified prior to making his/her selection.")); see also Mem. in Opp., Exh. I at PageID #: 4404.

> in the VAMROC who possess relatively the same
> qualifications.  The minimum area of
> consideration is the VAMROC Honolulu, Hawaii.
> The minimum area of consideration should be
> extended whenever additional highly qualified
> candidates are required in the interest of
> efficiency and effectiveness of station
> operations.

[Mem. in Opp., Exh. I at PageID #: 4404, Art. IX, § 1.]  In

addition, Henry argues she should have received a veterans'

preference during the selection process.  See Mem. in Opp. at 2-

3; see also Seghorn Decl., Exh. A (Program Specialist Position

Description and other documents for the positions) at PageID

#: 3204 (Veterans' Preference section in the USAJOBS - Job

Announcement).  According to Henry, the failure to give

preference to internal applicants and the failure to give her

the veteran's preference are indications that her non-selection

was discriminatory and/or retaliatory.

Henry argues it was improper for Seghorn to consider

Pittman as an internal hire because he had not been with the

PIHCS for a year, and Henry contends it was improper to allow

Pittman to sit on the selection panel when he himself was an

applicant for that position.  Henry also argues the selection

process was discriminatory because: Palumbo, and not Ching, was

sitting on the panel during her interview;[10] and there were

---

[10] Henry states that, after the interview, she asked Palumbo
how she did, and he said she did well.  When she was not
(. . . continued)

9

alterations to the interview scores, which resulted in Henry receive a lower score and Jacinto receiving a higher score. According to Henry, Seghorn should not have concluded that Jacinto was the "'best fit'" for the position without interviewing Henry.  [Mem. in Opp. at 3.]  Henry argues the irregularities in the Program Specialist selection process should be considered in light of the fact that, during the relevant time period, there were "very few African American females working as Program Specialists."  [Id. (citing Exhibits G and H).[11]]

## II.  Background Relevant to the Other Disparate Treatment Claims and the Hostile Work Environment Claims

Henry asserts she was subjected to a hostile work environment because of her "race, color, sex, gender, age[,] physical and mental disability."  [Mem. in Opp. at 4.]  She states she experienced a hostile, intimidating, and offensive work environment, and this interfered with her ability to perform her work.  [Id. at 6.]  Some of the incidents that Henry

_____

selected for the position, Henry tried to get more information from Palumbo, but his office told her he had transferred.  [Mem. in Opp. at 3.]  Neither party has presented testimony from Palumbo in connection with the instant Motion.

[11] Exhibit G is a collection of materials related to Henry's EEO complaints, and Exhibit H is an Organizational Chart for the VA PIHCS Office of the Chief of Staff.  [Dkt. nos. 57-14, 57-15.]

relies upon to support her hostile work environment claims also appear to be the basis of other disparate treatment claims.

## A.   **Henry's Workload**

Henry alleges that she was given extra work to complete and that her race and color was a factor because no one else was given a comparable amount of additional work. [Miyamato Decl., Exh. G (Henry Trans.) at 57-58.]  Henry states some of her additional tasks, including correcting her co-workers' errors, were given to her because of Dr. Dubbs's confidence in her abilities and her work ethic.  However, she argues that, because of the discrimination against her, she was not given the additional time necessary to complete the extra tasks.  [Mem. in Opp. at 4.]

Henry acknowledges that, because she had a GS-9 position, she had additional responsibilities that Wahl and Duarte, who had GS-6 positions, did not have.  Henry also acknowledges that Amina, who had a GS-11 position, had other additional responsibilities which neither Henry nor Wahl and Duarte had.  However, Henry asserts some of the additional responsibilities associated with Amina's position were given to Henry, Wahl, and Duarte to complete.  [Miyamato Decl., Exh. G (Henry Trans.) at 58-59.]  Henry also believes her disability was a factor in the discriminatory assignment of additional work because she had already "expressed that [she was] overwhelmed"

by the additional work and the unhealthy working environment. [Id. at 59.]  Further, her prior EEO activity was a factor because the leadership was aware of her prior complaint, and they were aware of the fact that they could not retaliate against her.  [Id.]

When asked to identify any similarly situated employees who were treated more favorably, Henry responded that, when either Wahl or Duarte had additional work, they would help each other, or sometimes Amina would do the work.  [Id. at 60.] Henry believed that explained why neither Wahl nor Duarte was "stressed out with the work."  [Id.]  Henry acknowledged that, because she was the only GS-9 employee in the MSO, there was no one else in a comparable position to help her with her work. [Id.]

In response to the instant Motion, Henry states that, during a period when Amina was often out of the office because of domestic issues, Henry had to perform some of Amina's duties. Henry received a $3,000 award in recognition of that additional work.  [Mem. in Opp. at 5  (citing Mem. in Opp., Exh. M)).]

Defendant presents evidence that, during the period in question, Nakasato was "an unofficial advisor and mentor for the

MSO."[12]  [Nakasato Decl. at ¶¶ 12, 14.]  She was therefore aware of Henry's workload and believes it "was fair and fully manageable" and was no more "than someone in [Henry'] position should be able to handle."  [Id. at ¶ 14.]  Similarly, Amina states Henry's workload was fair and that it was comparable to the workload of the two GS-6 employees in the MSO, even though Henry was in a G-9 position.  [Amina Decl. at ¶ 9.]  Amina states that, at one point, she told Henry she was preparing for surgery, and that Henry would have additional work during Amina's medical leave.  [Amina Decl. at ¶ 10.]  Because Henry was a GS-9 employee, Henry was "the next person in line to take charge [of] and fulfill [Amina's] duties" during Amina's absence.  [Id.]  However, that ultimately did not occur because the MSO instead divided Amina's tasks so that her duties were divided equally between Henry and the two GS-6 employees.[13]  [Id.]

_____

[12] In December 2018, Nakasato's job description was revised so that the MSO reports directly to her.  [Nakasato Decl. at ¶ 12.]

[13] In contrast, Henry states that, during Amina's two-month sick leave, Wahl and Duarte "were instructed to call Ms. Amina at home for assistance with tasks which was demeaning [to Henry's] leadership and work ethic as second in charge."  [Mem. in Opp. at 4-5 (citation omitted).]

### B.   <u>Verbal Counseling</u>

In 2017, Dr. Ryder learned that Henry failed to identify a medical provider who needed a credential renewal because Henry was using "a generated spreadsheet" instead of VetPro to identify providers who needed to renew their credentials.[14]  [Ryder Decl. at ¶¶ 7-8.]  Dr. Ryder conducted a verbal counseling with Henry about the required processes, and Nakasato was present for the counseling.  [<u>Id.</u> at ¶¶ 9-10.]  According to Dr. Ryder, the discussion was calm, and the verbal counseling was not a disciplinary action, nor did it become part of Henry's personnel record.[15]  Thus, it did not affect Henry's position or pay.  [<u>Id.</u> at ¶¶ 10-12.]  Dr. Ryder states that, after the counseling, Henry sent her "an e-mail stating that she appreciated [their] meeting."  [<u>Id.</u> at ¶ 13.]  Dr. Ryder states she did not consider Henry's age, gender, race, color, prior EEO activity, or disability when she decided to give Henry a verbal counseling.  [<u>Id.</u> at ¶ 18.]

Henry disputes Defendant's characterization of the events, stating Dr. Ryder "accused [her] of not doing [her] job

---

[14] Amina states that, "[o]n occasion, I would create spreadsheets for my own tracking, and I would let my co-workers use the spreadsheets to assist in the scope of our work," but Amina "never instructed them to use only the spreadsheet." [Amina Decl. at ¶ 19.]

[15] Nakasato's description of the verbal counseling is consistent with Dr. Ryder's.  <u>See</u> Nakasato Decl. at ¶ 18.

in a very offensive tone." [Mem. in Opp. at 10.] Henry argues the verbal counseling by Dr. Ryder "added to the hostility" in the MSO because: Henry believes the provider's name was intentionally omitted from the credentialing list and the provider's file was withheld by Duarte; the provider's credentialing file was ultimately completed before the review meeting; and Henry reported these circumstances to Dr. Ryder, but Dr. Ryder agreed with Amina's assessment of the situation. [Mem. in Opp. at 7 , 10.] Henry was "very offended" by the verbal counseling because VA leadership was aware of her hostile work environment complaints. [Id. at 10.]

     C.   **Intra-Office Issues**

     Henry's internal complaint alleged her co-workers whispered about her, isolated her, yelled at her, and sent her unprofessional emails. [Miyamoto Decl., Exh. G (Henry Trans.) at 33, 38.] According to Henry, her co-workers would whisper about her when they were trying to find mistakes that she had made because they wanted to bring Henry's mistakes to their supervisor's attention. They also talked about work that they thought Henry should have been doing but was not doing. [Id. at 33.] They did not want Henry to hear what they were talking about because "[t]hey want[ed Henry] to not get the work done because they [we]re trying to sabotage" Henry's work. [Id.] Henry also stated Amina would show emails that Henry sent

directly to Amina or a care provider to others in the MSO, and they would whisper about what Henry wrote.  Henry knew what her co-workers would whisper about because sometimes she could still hear their whispered conversations.  [Id. at 34-36.]

Henry described the following instances in which her work was sabotaged: her co-workers intentionally left a provider's name off of the spreadsheet so that Henry would fail to renew his credentials;[16] Amina withheld a provider's credentialing paperwork for approximately three weeks so that Henry had to process the paperwork overnight; and, although someone else had started working on that provider's file, the file was subsequently deleted.  [Id. at 36-38.]  Henry also alleges there were multiple instances when Amina deleted Henry's work from the shared drive that they both had access to.  [Id. at 38-40.]  However, Henry admitted she had no proof that Amina, or anyone else, was responsible for the deletion of Henry's work.[17]  [Id. at 41.]

_____

[16] Henry admitted she had no evidence to support her belief that the provider was intentionally omitted that the omission from the spreadsheet "could have been a human error."  [Miyamoto Decl., Exh. G (Henry Trans.) at 38.]

[17] Amina denies taking action that interfered with any provider's file that Henry worked on.  See Amina Decl. at ¶ 11. Nakasato states she not aware of any attempt to sabotage Henry's work, and Nakasato emphasizes that the MSO as a whole "is responsible for the accuracy of all the work being done, and any mistake reflects badly on the office as a whole."  [Nakasato Decl. at ¶ 17.]

According to Henry, her co-workers have called her "delusional," "told [her] they don't care for" her, and said "being around [her] is like being in a morgue." [Id. at 43.] Henry believed Amina and Duarte staged an argument between them to try to bait Henry to either quit or to interrupt and "go off on" them, but Henry just tried to ignore them. [Id. at 43-44, 60.] Henry reported the issues in the MCO to the PIHCS leadership, but no corrective action was taken. [Id. at 44.] Henry believes she was targeted by her co-workers based on her race and color because she asked them not to discuss race and color in her presence, but they continued to do so. Further, Nakasato was aware that the staff ignored Henry's request, but Nakasato did nothing to try to stop the negative discussions about race and color. [Mem. in Opp. at 4-5.]

Amina states that, in 2016 and 2017, she was aware of Henry's race, color, and gender, but she did not know about either Henry's prior EEO activity or Henry's disability. [Amina Decl. at ¶ 5.] Wahl and Duarte state the same with regard to 2017, except that Duarte was aware of Henry's prior EEO activity. [Wahl Decl. at ¶ 4; Duarte Decl. at ¶ 4.] Amina did not consider Henry's race, color, age, gender, prior EEO activity, or disability when she interacted with Henry during 2016 and 2017. Further, Amina never saw: Henry being harassed; Henry being subjected to a hostile work environment; someone

17

gossip, whisper, or spread rumors about Henry; nor someone sabotage Henry's work.  [Amina Decl. at ¶¶ 13-16.]  Wahl provides the same testimony as to 2017.  See Wahl Decl. at ¶¶ 12-14, 18; Duarte Decl. at ¶¶ 12-14, 18.  Wahl and Duarte both state they never saw Amina treat Henry differently than Amina treated other MSO employees.  [Wahl Decl. at ¶ 11; Duarte Decl. at ¶ 11.]

Nakasato "was not aware of anyone in the MSO being instructed not to communicate with Ms. Henry nor did [Nakasato] ever witness anyone harassing, yelling at, whispering about, gossiping about, or spreading rumors about Ms. Henry." [Nakasato Decl. at ¶ 16.]  However, because she observed that there was a breakdown in communication in the MSO, Nakasato "implement[ed] weekly staff 'huddles,'" where "each person would go over the files they were working on and share best practices to help each other improve."  [Id. at ¶ 15.]  Nakasato believes: "[t]he issues in office dynamics were all work-related"; the issues "appeared to start around the same time when" the management reviewed everyone's workload in an effort to improve office efficiency; and the issues "had nothing to do with Ms. Henry's or anyone's age, race, gender, color, any alleged disability, or prior EEO activity."  [Id. at ¶¶ 19-20.]

Even after the implementation of the office huddles, Henry made additional complaints about the office dynamics.  See

18

Nakasato Decl. at ¶ 21.  The management therefore brought in a clinical psychologist "to meet with the staff, talk about different personalities and dynamics, and do various assessments and surveys with staff to help them understand how to work with each other."  [Id.]  In addition, a federal mediator was brought in to "work[] with the group to help them talk thing [sic] out and better understand where each person is coming from."  Id.; see also Miyamoto Decl., Exh. F (Summary Aff., dated 12/21/17 by VA Office of Resolution Management Investigator James A. Harding ("Harding"), summarizing his of interview of Dr. Dubbs and affirmed by Dr. Dubbs on 1/13/18 ("Dubbs Summary Aff."))[18] at PageID #: 3243 (stating Dr. Dubbs brought the mediator in). Nakasato believes management did what it could to try to improve the office dynamics in the MSO.  [Nakasato Decl. at ¶ 22.]

Henry participated in at least five mediation sessions, but she believes the mediation sessions did not work because her co-workers did not want them to work.  [Miyamoto Decl., Exh. G (Henry Trans.) at 40.]  According to Henry, Duarte said that, during the EEO investigation, the investigator asked Duarte why everyone in the MSO could not "just get along, and she told him that she don't want to get along."  [Id. at 41.]

---

[18] Exhibit F includes email messages between Harding and Dr. Dubbs regarding the summary affidavit.

Duarte also told their co-workers that she refused to work with Henry.  [Mem. in Opp. at 11.]

When Dr. Dubbs was on leave, Dr. Ryder formed a task force to address Henry's claims alleging a hostile work environment and violations of the directive regarding duty hours.  [Ryder Decl. at ¶ 17, Exh. D (VA Memorandum dated 6/14/17 from Dr. Ryder, as Acting Chief of Staff, initiating a Fact-Finding Investigation).]  The task force concluded that Henry's claims could not be substantiated.  [Ryder Decl. at ¶ 17, Exh. E (Fact Finding Inquiry, dated 8/9/17).]  Dr. Ryder did not consider Henry's age, gender, race, color, prior EEO activity, or disability when she responded to Henry's workplace complaints.  [Ryder Decl. at ¶ 18.]  The task force was made up of managers from outside of the department that the MSO is a part of.  [Miyamoto Decl., Exh. F (Dubbs Summary Aff.) at PageID #: 3243.]  Henry argues the task force's investigation was biased because all of the members work for the PIHCS Director, and she argues the questions posed by the task force were designed to avoid the issue of a hostile work environment and to focus only on work-related issues.  [Mem. in Opp. at 6.]

On one occasion, Henry informed Dr. Dubbs that she was concerned for her safety at the MSO, but he found there was no evidence or information to support this belief.  [Miyamoto Decl., Exh. F (Dubbs Summary Aff.) at PageID #: 3242.]

20

Dr. Dubbs states he did not consider Henry's race, color, disability, prior EEO activity, or gender in any of his decisions regarding Henry.  [Id. at PageID #: 3243, 3245.]  He also denies that Henry was treated less favorably than any other similarly situated employee because of Henry's race, color, disability, or prior EEO activity.  [Id. at PageID #: 3243.]

According to Amina, there was no reason why Henry should have felt unsafe at work.  [Amina Decl. at ¶ 24.] Further, the only potential safety issue that Dr. Ryder is aware of is one instance when one of Henry's co-workers was ordered by management to unplug her curling iron.  [Ryder Decl. at ¶ 16.] During her interview with the VA EEO investigator, Henry stated she was concerned about her safety because, on one occasion, Duarte bumped Henry's chair and did not apologize or say, "excuse me," which offended Henry.  [Miyamoto Decl., Exh. G (Henry Trans.) at 42-43.]  On another occasion, Wahl was getting ready to leave the office for the day, and Wahl said that everyone would "see the cat fight tomorrow."  [Id. at 43.]  When Henry asked Wahl what she meant, Wahl said she was expecting a cat fight because of the email messages between Henry and Duarte.  [Id.]  It also appears that Henry was concerned about her safety and well-being because she believed that Amina, Duarte, and Wahl "always target[ed]" her and accused her if anything went wrong in the office.  [Id.]

However, in response to the instant Motion, Henry
states she feared for her safety because of domestic issues
between Amina and her husband, which Henry asserts required the
relocation of MSO to a secured office space.  Henry also states
a building security guard asked Henry to sign, as a witness, a
document that Amina submitted in connection with a request for a
temporary restraining order against her husband.  [Mem. in Opp.
at 5.]  Henry also alleges that someone tampered with her
personal vehicle: by opening the door covering the gas cap in
2017; and by putting white paint or white correction fluid on
the side of the vehicle in January 2019.[19]  Henry believes one of
her co-workers tampered with her vehicle because the incident
came up during one of the MSO's mediation sessions.  [Id. at 6.]

Amina and Wahl both state they were unaware of anyone
being instructed not to speak with Henry.  [Amina Decl. at ¶ 14;
Wahl Decl. at ¶ 12.]  Amina, Wahl, and Duarte each acknowledges
that, in 2017, she primarily communicated with Henry by email
because Henry "would often accuse her co-workers of harassment
when discussing work related issues."  [Amina Decl. at ¶ 23;
Wahl Decl. at ¶ 17; Duarte Decl. at ¶ 17.]

---

[19] The 2019 incident occurred after Henry was no longer
working in the MSO, but, for purposes of the instant Motion,
this Court will assume the incident is relevant as context for
the alleged conduct during the period at issue in Henry's
claims.

Because of the hostile work environment, Henry requested a transfer out of the MSO, but her request was denied, based on the results of the task force's fact-finding investigation and Dr. Dubbs's review of Henry's complaints. Further, it is PIHCS policy that an employee cannot obtain a transfer to another position based solely on her unhappiness with her position. [Miyamoto Decl., Exh. F (Dubbs Summary Aff.) at PageID #: 3243.] Henry was eventually transferred out of the MSO in February 2018, but she states a transfer was granted "only because she signed a voidable agreement." [Mem. in Opp. at 6.] Henry alleges her initial transfer requests were denied because her supervisors discriminated against her and retaliated against her because she reported the hostile work environment. [Id.]

## III. **The Instant Case**

Henry alleges she was subjected to: 1) disparate treatment because of her non-selection for the two Program Specialist positions in 2016, the verbal counseling by Dr. Ryder, and the denial of her initial transfer requests; and 2) a hostile work environment that included harassment on a daily basis from 2016 to 2018, and other various incidents. She alleges both the disparate treatment and the hostile work environment constituted: unlawful discrimination based upon her race, color, gender, age, and disability; and retaliation for

her EEO complaints.  See Amended Complaint at PageID #: 227-30. Defendant seeks summary judgment as to all of Henry's claims.

## DISCUSSION

### I.   Disparate Treatment Claims

#### A.   Non-Selection

The primary basis for Henry's disparate treatment claims is her non-selection for the two Program Specialist positions in 2016.  The burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to all of Henry's claims based on her non-selection, which she brings pursuant to Title VII, the ADEA, and the ADA".  See Freyd v. Univ. of Or., 990 F.3d 1211, 1228 (9th Cir. 2021) (Title VII disparate treatment claim); Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105-06 (9th Cir. 2008) (Title VIII retaliation claim); Curley v. City of N. Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014) (ADA discrimination and retaliation claims); Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008) (ADEA discrimination claim); Stilwell v. City of Williams, 831 F.3d 1234, 1246-47 (9th Cir. 2016) (stating "the ADEA retaliation provision [is] the equivalent of the anti-

retaliation provision of Title VII" (citation and internal

quotation marks omitted)).[20]

> Under the McDonnell Douglas burden-shifting analysis,
>
> the plaintiff must make out a prima facie case.
> McDonnell Douglas Corp., 411 U.S. at 802, 93 S.
> Ct. 1817.  Once the prima facie case is made, a
> presumption of unlawful discrimination is created
> and the burden shifts to the defendant to
> articulate a "legitimate, nondiscriminatory
> reason" for its action.  Id.  If the defendant
> meets that burden, the plaintiff must produce
> evidence that the defendant's "proffered
> nondiscriminatory reason is merely a pretext for
> discrimination."  Dominguez-Curry v. Nev. Transp.
> Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005).

Weil v. Citizens Telecom Servs. Co., 922 F.3d 993, 1002 (9th

Cir. 2019).

> ### 1.   **Prima Facie Case**

In order to make prima facie case for a Title VII non-

selection/failure-to-promote claim,

> a plaintiff must show that (1) she belongs to a
> protected class; (2) she applied for and was
> qualified for the position she was denied;
> (3) she was rejected despite her qualifications;
> and (4) the employer filled the position with an
> employee not of plaintiff's class, or continued
> to consider other applicants whose qualifications
> were comparable to plaintiff's after rejecting
> plaintiff.  See McDonnell Douglas, 411 U.S. at
> 802, 93 S. Ct. 1817.  At summary judgment, the
> degree of proof necessary to establish a prima

---

[20] A plaintiff can also establish her disparate treatment claim by establishing discriminatory intent through direct or circumstantial evidence.  See, e.g., Freyd, 990 F.3d at 1228. Henry has not presented any evidence that Seghorn, the selecting official, made the selection for either the Program Specialist position with discriminatory intent.

> facie case is "minimal and does not even need to
> rise to the level of a preponderance of the
> evidence." Lyons v. England, 307 F.3d 1092, 1112
> (9th Cir. 2002) (quoting Wallis v. J.R. Simplot
> Co., 26 F.3d 885, 889 (9th Cir. 1994)).

Dominguez-Curry, 424 F.3d at 1037.  The elements of a prima

facie case for an ADA discrimination claim and an ADEA

discrimination claim are similar.  See Whaley v. Bonded Logic

Inc., No. CV-19-02442-PHX-DJH, 2020 WL 5593882, at *2 (D. Ariz.

Sept. 18, 2020) ("(1) that he was disabled under the ADA,

(2) that he can perform the essential functions of the job with

or without reasonable accommodation, and (3) that the employer

terminated him because of his disability" (citing Dunlap v.

Liberty Nat. Prods., Inc., 878 F.3d 794, 798–99 (9th Cir.

2017))), appeal dismissed, No. 20-17051, 2021 WL 1529303 (9th

Cir. Feb. 23, 2021);[21] Stewart v. Wilkie, 855 F. App'x 394 (9th

Cir. 2021) ("In a non-selection ADEA case . . . , a plaintiff

may establish a prima facie case by producing evidence that he

was '(1) at least forty years old, (2) qualified for the

position for which [he applied], (3) denied the position, and

(4) the [position] was given to a substantially younger person."

---

[21] However, in an ADA claim, the employee's disability must
be the "but for" cause of the adverse employment action, not
merely "a motivating factor." Murray v. Mayo Clinic, 934 F.3d
1101, 1105 (9th Cir. 2019), cert. denied, 140 S. Ct. 2720
(2020).

(some alterations in Stewart) (quoting Shelley v. Geren, 666 F.3d 599, 608 (9th Cir. 2012))).

Viewing the record in the light most favorable to Henry,[22] she has established the following prima facie elements relevant to all of her disparate treatment claims: she is a member of a protected class (race, color, gender, disability, age, and engaging in protected activity); she was qualified for the Program Specialist positions; and she was not selected for either position.  Pittman, who was selected for the first Program Specialist position, is outside of Henry's protected class for purposes of her Title VII gender discrimination claim because he is an African-American male, whose "color is black." See Pittman Decl. at ¶ 21.  Viewing the record in the light most favorable to Henry, Jacinto, who was selected for the second Program Specialist position, is outside of Henry's protected class for purposes of her Title VII race, and possibly color, discrimination claim because Jacinto is a "non-African American female."  See Mem. in Opp. at 3 .  Henry has therefore established, for purposes of the instant Motion, her prima facie case for her Title VII race and color discrimination claims.

---

[22] In determining whether there is a genuine issue of material fact that precludes summary judgment, a court must view the record in the light most favorable to the non-moving party. Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013).

There is no evidence in the record regarding whether either Pittman or Jacinto: has a disability, as defined in the ADA; engaged in protected activity prior to the Program Specialist selection process; or was substantially younger than Henry, who describes herself as "over 50 years old."  See Mem. in Opp. at 4  (stating Henry "was the only African American (dark-skinned) female veteran over 50 years old diagnosed with anxiety and adjustment disorder disabilities **in her office**" (emphasis added)).  Thus, Henry arguably has failed to establish, or raise a genuine issue of material fact as to,[23] her prima facie case for her ADA discrimination claim, her ADEA discrimination claim, or any of her retaliation claims.  However, even if Henry established her prima facie case as to those claims, Defendant would still be entitled to summary judgment, for the reasons explained below.

## 2.   **Legitimate, Nondiscriminatory Reasons**

Defendant has responded with evidence that there were legitimate, nondiscriminatory reasons for Henry's non-selection for both Program Specialist positions.  Seghorn selected Pittman in a noncompetitive appointment to the first Program Specialist position because of his participation in the GHATP at the PIHCS.

---

[23] A party is entitled to summary judgment if the party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The program required the hosting facility to place the participant in an available position at the end of the one-year program.  [Seghorn Decl. at ¶ 7; Pittman Decl. at ¶¶ 4-5.]  The Program Specialist Position Description was signed on April 1, 2016.  [Seghorn Decl., Exh. A at PageID #: 3191.]  Pittman's year with the GHATP was from June 2015 to June 2016.  [Pittman Decl. at ¶ 6.]  In June 2016, Pittman met with the director of the PIHCS to discuss his opportunities upon the completion of the training program.  After that meeting, Seghorn and Pittman agreed that he would be appointed to one of the Program Specialist positions.  [Id. at ¶ 10.]  Thus, even viewing the record in the light most favorable to Henry, there was a legitimate, nondiscriminatory reason for Henry's non-selection for the first Program Specialist position.

As to the second position, Seghorn appointed the selection panel and provided the panel with standardized questions and a scoring matrix.  Seghorn relied upon the panel's judgment and accepted the panel's recommendation of the two top candidates - Jacinto and Gonzalez, and Seghorn also discussed DeVoto with the panel because he was the third-ranked candidate.  She spoke with Jacinto and Gonzalez and selected Jacinto.  [Seghorn Decl. at ¶¶ 8-14.]  Before doing so, and after the selection panel interviewed the candidates, Seghorn "glanc[ed] over Ms. Henry's resume and scoring sheet[, but Henry's] score

29

was not among the top five candidates." See id. at ¶ 12. Seghorn states that, in selecting Jacinto, she did not consider anyone's race, color, gender, disability, age, or previous protected activity. [Id. at ¶ 15.] Even viewing the record in the light most favorable to Henry, there was a legitimate, nondiscriminatory reason for Henry's non-selection for the second Program Specialist position.

### 3. **Pretext**

The Ninth Circuit has stated:

> A "plaintiff may establish pretext either
> directly by persuading the court that a
> discriminatory reason more likely motivated the
> employer or indirectly by showing that the
> employer's proffered explanation is unworthy of
> credence." Godwin [v. Hunt Wesson, Inc.], 150
> F.3d [1217] 1220 [(9th Cir. 1998)] (internal
> quotation marks omitted). If a plaintiff uses
> circumstantial evidence to satisfy this burden,
> such evidence "must be specific" and
> "substantial." Id. at 1221. "An employee in
> this situation can not [sic] simply show the
> employer's decision was wrong, mistaken, or
> unwise." Morgan v. Regents of the Univ. of Cal.,
> 88 Cal. App. 4th 52, 105 Cal. Rptr. 2d 652,
> 670(2000) (internal quotation marks omitted).
> "Rather, the employee must demonstrate such
> weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the
> employer's proffered legitimate reasons for its
> action that a reasonable factfinder could
> rationally find them unworthy of credence . . .
> and hence infer that the employer did not act for
> the . . . non-discriminatory reasons." Id.
> (internal quotation marks, emphasis, and citation
> omitted).

_Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc._, 642 F.3d 728, 746 (9th Cir. 2011) (some alterations in _Lucent Techs._).[24]

As to the first Program Specialist position, Henry appears to argue the stated reason for Pittman's selection is pretextual because there is insufficient personnel documentation, such as a Standard Form 50, to corroborate Defendant's evidence about Pittman's prior experience with the VA. _See_ Mem. in Opp. at 8. Defendant submitted declarations by Seghorn and Pittman, signed under penalty of perjury, describing Pittman's work with the GHATP at the PIHCS. Although Henry believes other documentation could have been presented both during the VA's internal investigation and during this case, Henry has not presented any evidence which creates a genuine

---

[24] _Lucent Technologies_ and _Morgan_ involved discrimination claims brought pursuant to the California Fair Employment and Housing Act ("FEHA"). _Lucent Techs._, 642 F.3d at 734; _Morgan_, 105 Cal. Rptr. 2d at 661. However, courts have also applied the analysis in _Lucent Technologies_ and _Morgan_ in cases where other types of claims were asserted. _See, e.g._, _Okafor v. Cal. Dep't of Conservation_, Case No. SACV 15-01626-CJC(JCGx), 2018 WL 6264974, at *6-8 (C.D. Cal. Jan. 23, 2018) (granting summary judgment in favor of the defendant as to discrimination claims brought under Title VII and the California FEHA), _aff'd_, 775 F. App'x 321 (9th Cir. 2019); _see also_ _Zhang v. Cnty. of Monterey_, 804 F. App'x 454, 457 (9th Cir. 2020) (affirming the grant of summary judgment in favor of the defendant as to discrimination claims brought pursuant to Title VII, the FEHA, and 42 U.S.C. § 1981); _Pierson v. City of Phoenix_, No. CV-16-02453-PHX-DLR, 2017 WL 4792122, at *4-5 (D. Ariz. Oct. 24, 2017) (granting summary judgment in favor of the defendant as to discrimination claims brought pursuant to Title VII and the ADEA).

issue of fact as to either Pittman's participation in the GHATP or the GHATP's requirement that the host facility place the participant in an available position at the end of the program.

Even assuming, for purposes of the instant Motion, that Henry has established her prima facie case for her discrimination and retaliation claims based on her non-selection for the first Program Specialist position, Defendant has established a legitimate, nondiscriminatory reason for her non-selection, and Henry failed to identify a genuine issue of fact for trial as to the issue of whether that reason was a pretext for either illegal discrimination or illegal retaliation. Defendant is therefore entitled to summary judgment as to all of Henry's claims that are based upon her non-selection for the first Program Specialist position.

As to the second Program Specialist position, Henry appears to argue the reasons for her non-selection were pretextual because she should have been selected, based on her work ethic, experience - including performing Amina's tasks when Amina missed work because of domestic issues, and her education. [Mem. in Opp. at 7.] However, she cannot avoid summary judgment by attempting to establish, or create an issue of fact as to whether, her "employer's decision was wrong, mistaken, or unwise." See Lucent Techs., 642 F.3d at 746 (citation and quotation marks omitted); see also Bradley v. Harcourt, Brace &

32

Co., 104 F.3d 267, 270 (9th Cir. 1996) (stating "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

Henry also argues the interview panel for the second Program Specialist position was not objective, and this raises a genuine issue of fact as to whether the stated reason for her non-selection was pretext.  Henry points out that: Pittman was appointed to the selection panel, even though he applied for the same position; Nakasato was aware of Henry's complaints about the hostile work environment, but Nakasato failed to recuse herself from the panel; and the candidates were not scored in an identical manner because the same panel did not interview all of the candidates.  [Mem. in Opp. at 8-9.]  Although two Program Specialist positions were listed in April 2016, Pittman was selected in June 2016, or shortly thereafter, and he did not serve on the selection panel until August and September 2016. [Seghorn Decl., Exh. A at PageID #: 3191; Pittman Decl. at ¶¶ 10-11.]  Thus, Pittman was not in competition with the applicants whom he interviewed while on the selection panel. Moreover, there is no evidence to support Henry's position that Pittman's presence on the panel indicates the reasons for Henry's non-selection were pretextual.  Cf. Pittman Decl. at ¶ 18 (stating Pittman did not consider Henry's age, gender, race, or color, and he was not aware of her disability or her

prior EEO activity); id. at ¶ 19 (stating Pittman is sensitive to the issue of discrimination in selections and that he would go out of his way to ensure no candidate was discriminated against).

Similarly, although Henry argues Nakasato should not have sat on the selection because of her knowledge of the hostile work environment Henry experienced and of Henry's complaints, there is no evidence to suggest that Nakasato considered those circumstances in the selection process.  In fact, Nakasato thought Henry "did well" in the interview, and placed Henry "high in [her] list of candidates."  [Nakasato Decl. at ¶ 8.]  There is no evidence to support Henry's position that Nakasato's presence on the selection panel indicates the reasons for Henry's non-selection were pretextual.  Cf. Nakasato Decl. at ¶ 10 (stating Nakasato did not consider Henry's age, gender, race, or color, and she was not aware, at the time of the selection process, of Henry's disability or prior EEO activity).  Although Palumbo participated in the first day of interviews and Ching participated in the second day, Henry has not identified any evidence which raises triable issue of fact as to whether Ching's replacement of Palumbo was for other reasons besides the fact that one of the two was unavailable. See Seghorn Decl. at ¶ 8; Ching Decl. at ¶ 3.

Henry has also suggested that the interview scoring sheets were altered in a discriminatory manner because some numbers were crossed off and applicants had more than one total score.  This is not evidence of pretext because the same line scores were crossed out for each candidate, and no candidate ultimately received points for the eliminated item, which measured the applicant's professionalism in his or her appearance.  See Pittman Decl., Exh. B at PageID :# 3209, 3212, 3215, 3218; Nakasato Decl., Exh. C at PageID #: 3222, 3225, 3228, 3231.  Where the panelist had already written an applicant's total score with a score for the omitted item, the total was crossed out and a new total was written.  Thus, the scoring sheets do not raise a genuine issue of material fact as to pretext.

Henry states: "The agency said they selected Ms. Jacinto because she was the best fit for the position." [Mem. in Opp. at 15.]  She argues the "best fit" explanation is a pretext for illegal discrimination, and she asserts it is often used to select someone "due to race, sex or history of a relationship."  [Id.]  Even accepting that VA made the "best fit" statement, Henry merely speculates that the term is pretext for a discriminatory selection.  Her conclusory and speculative testimony does not raise a genuine issue of fact as to pretext and is insufficient to defeat summary judgment.  See Thornhill

Publ'g Co. v. Gen. Tel. & Elec. Corp., 594 F.2d 730, 738 (9th Cir. 1979).

Henry also argues the fact that Seghorn did not interview her, in spite of her veteran's preference, is evidence that the stated reasons for her ultimate non-selection were pretextual. There is evidence in the record that Henry was entitled to a veteran's preference in personnel decisions. [Mem. in Opp., Exh. F at PageID #: 4255.] Pittman is a veteran, [Pittman Decl. at ¶ 2,] but Jacinto is not, see Mem. in Opp., Exh. F at PageID #: 4288 (Jacinto's Notification of Personnel Action (Standard Form 50), effective 6/26/16, noting she is not entitled to a veteran's preference). However, Henry's veteran's preference did not **require** Seghorn to select Henry over Jacinto. See 38 U.S.C. § 7405(a)(1)(D) ("The Secretary, upon the recommendation of the Under Secretary for Health, **may** employ, without regard to civil service or classification laws, rules, or regulations, personnel as follows: (1) On a temporary full-time basis, part-time basis, or without compensation basis, persons in the following positions: . . . . (D) Other professional, clerical, technical, and unskilled personnel (including interns, residents, trainees, and students in medical support programs)." (emphasis added)). Further, even if the selection panel and Seghorn erroneously failed to consider Henry's veteran's preference, that error, in and of itself, does

36

raise a triable issue of fact as to pretext.  Cf. Phillips v. Mabus, Civil No. 12-00384 LEK-RLP, 2013 WL 4662960, at *19 (D. Hawai`i Aug. 29, 2013) (stating that, even if the plaintiff's veteran's preference points were erroneously omitted, "the error, in and of itself, does not constitute evidence of discriminatory animus"), aff'd, 607 F. App'x 762 (9th Cir. 2015).

Similarly, even if the VAMROC Union Agreement required Seghorn to interview Henry before Seghorn made a selection, see Mem. in Opp., Exh. I at PageID #: 4404, Art. IX, § 4, Seghorn's failure to do so, in and of itself, does not raise a triable issue of fact as to pretext.  This is particularly true because the union agreement recognizes that, ultimately, promotion decisions are made based on merit.  See id. at PageID #: 4404, Art. IX, § 1 (stating "promotions will be based on merit . . . and be guided by the objective of obtaining the best qualified persons available"); id. at PageID #: 4405, Art. IX, § 6 ("A Merit Promotion Policy for competitive promotion is in existence . . . .").

Even viewing the record in the light most favorable to Henry, there is insufficient evidence to raise a genuine issue of fact for trial as to the issue of pretext.  Defendant is therefore entitled to summary judgment as to all of Henry's

37

discrimination and retaliation claims based on her non-selection for the two Program Specialist positions.

## B.  **Other Disparate Treatment Allegations**

To the extent that Henry's disparate treatment claims are based, in part, on the verbal counseling by Dr. Ryder and the denial of Henry's requests to transfer, those portions of her claims also fail.

### 1.  **Verbal Counseling**

Henry was "very offended" by Dr. Ryder's verbal counseling, and Henry contends the counseling was erroneous because she was not responsible for almost missing the provider's credentialing renewal.  [Mem. in Opp. at 10.]  The Ninth Circuit has stated "an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (alterations, internal quotation marks, and citation omitted).  Henry has not identified any evidence which suggests that the verbal counseling had any of those types of effect on her employment.  Moreover, Henry has not identified any evidence suggesting that other employees outside of Henry's protected classes were not given verbal counseling when they made similar errors.  Because Henry has not raised a genuine issue of material fact for trial as to her prima facie case, Defendant is entitled to summary judgment as

38

to the portions of Henry's disparate treatment claims based on the verbal counseling by Dr. Ryder.

###        2.   **Denial of Transfer**

The Ninth Circuit has stated: "Adverse employment actions may include . . . situations in which the employer denies an employee a material employment benefit or opportunity that was otherwise available to her." Campbell v. Hawai`i Dep't of Educ., 892 F.3d 1005, 1013 (9th Cir. 2018) (citing Breiner v. Nev. Dep't of Corr., 610 F.3d 1202, 1208 (9th Cir. 2010) ("[T]he denial of a single promotion opportunity . . . is actionable under Title VII."); Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1124-25 (9th Cir. 2000) (denial of promotion to tenured position that had been promised to a professor was adverse employment action)).  Even assuming, for purposes of the instant Motion, that the denials of Henry's transfer requests were adverse employment actions, Henry only presents her own speculation that her transfer requests were denied because of discrimination and/or retaliation.  Further, Henry has not identified any evidence suggesting that other employees outside of her protected classes were granted transfers under comparable circumstances.  Because Henry has not raised a genuine issue of material fact for trial as to her prima facie case, Defendant is entitled to summary judgment as to the portions of Henry's

disparate treatment claims based on the denial of her transfer requests.

###   C.   **Ruling**

Thus, summary judgment is granted in favor of Defendant as to all of Henry's discrimination and retaliation claims alleging disparate treatment.

## II.  **Hostile Work Environment**

Henry's hostile work environment claims are based on the following: an excessive workload; the verbal counseling by Dr. Ryder; being yelled at, whispered about, insulted by, and isolated by her co-workers; receiving unprofessional emails from her co-workers; and having her work sabotaged by her co-workers. Henry also states she asked her co-workers not to discuss race and color in her presence, but they continued to do so.  Henry argues that, although PIHCS management was aware of the situation, it failed to respond appropriately to her complaints.

The Ninth Circuit has stated:

> "An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1109-10 (9th Cir. 2000) (quoting Pavon v. Swift Trans. Co., 192 F.3d 902, 908 (9th Cir. 1999)).  "'Conduct must be extreme to amount to a change in the terms and

> conditions of employment.'  To be actionable
> under Title VII, 'a sexually objectionable
> environment must be both objectively and
> subjectively offensive, one that a reasonable
> person would find hostile or abusive, and one
> that the victim in fact did perceive to be so.'"
> Montero v. AGCO Corp., 192 F.3d 856, 860 (9th
> Cir. 1999) (quoting Faragher v. City of Boca
> Raton, 524 U.S. 775, 787–88, 118 S. Ct. 2275, 141
> L. Ed. 2d 662 (1998)).  Courts determine whether
> an environment is sufficiently hostile or abusive
> by "'looking at all the circumstances,' including
> the 'frequency of the discriminatory conduct; its
> severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and
> whether it unreasonably interferes with an
> employee's work performance.'"  Kortan, 217 F.3d
> at 1110 (quoting Faragher, 524 U.S. at 787–88,
> 118 S. Ct. 2275).

Ariz. ex rel. Horne v. Geo Grp., Inc., 816 F.3d 1189, 1206 (9th

Cir. 2016).

     The elements of a hostile work environment claim under

the ADEA are similar.  See, e.g., Jaroslawsky v. City & Cnty. of

San Francisco, 671 F. App'x 998, 999 (9th Cir. 2016) (reviewing

the grant of summary judgment on the plaintiff's hostile work

environment claim under the ADEA).  The Ninth Circuit has not

ruled on the issue of whether a hostile work environment claim

can be brought under the ADA.  See McIntyre v. Eugene Sch.

Dist. 4J, 976 F.3d 902, 916 (9th Cir. 2020) (declining to decide

the issue of whether a hostile work environment claim is

actionable under the ADA, but noting that every other circuit

court to address the issue has held such a claim is actionable

(citing discussion in Ford v. Marion Cty. Sheriff's Office, 942

F.3d 839, 852 (7th Cir. 2019))).   To the extent that such a claim exists, its elements are similar to the elements of a Title VII hostile work environment claim.   See Ford, 942 F.3d at 856 (listing the elements of a claim for hostile work environment based on disability).

      "An employer is vicariously liable for a hostile work environment created by a supervisor."   Reynaga v. Roseburg Forest Prod., 847 F.3d 678, 689 (9th Cir. 2017) (citing Vance v. Ball State Univ., --- U.S. ----, 133 S. Ct. 2434, 2439, 186 L. Ed. 2d 565 (2013)).   However, "[w]here harassment by a co-worker is alleged, the employer can be held liable only where 'its own negligence is a cause of the harassment.'"   Swenson v. Potter, 271 F.3d 1184, 1191 (9th Cir. 2001) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).   This includes responding to a harassment complaint in a negligent manner.   Id. at 1196 (citing Ellerth, 524 U.S. at 759, 118 S. Ct. 2257).   In other words, an employer that responded to a complaint in a reasonable manner cannot be held liable under Title VII.   Id.

### A.   Direct Supervisor Involvement

      Henry states Nakasato was her "immediate supervisor/manager" during the period that Henry was experiencing the hostile work environment.   [Mem. in Opp. at 15.]   According to Nakasato, she was not in "Henry's management

42

chain" and was only "a mentor" and "unofficial monitor" of the MSO during the period in question.  [Nakasato Decl. at ¶ 12.] Even assuming that Nakasato was one of Henry's supervisors, there is no evidence that Nakasato directly participated in the creation of the allegedly hostile work environment.  Henry argues only that Nakasato was aware about Henry's concerns and failed to stop the objectionable conduct by Henry's co-workers. See, e.g., Mem. in Opp. at 4.  Henry also identifies Dr. Dubbs as one of her supervisors.  [Id.]  Henry, however, does not identify any evidence that Dr. Dubbs directly participated in the creation of the allegedly hostile work environment.  Henry focuses upon Dr. Dubbs's responses to her reports.  See, e.g., id. at 10 (stating Henry "sent leadership several emails, and talked to Dr. Dubbs In [sic] person in refence to the toxic hostile work environment").

        Henry includes the verbal counseling by Dr. Ryder as one of the events that contributed to the hostile work environment, and Henry argues Dr. Ryder, Nakasato, and Dr. Dubbs refused to consider the reasons that Henry later discovered explaining why Henry was not responsible for missing the provider's name on the credentialing list.  [Id. at 7, 10.] Viewing the record in the light most favorable to Henry, Dr. Ryder is one of Henry's supervisors for purposes of Title VII.  During the relevant period, Dr. Ryder was the Deputy

Chief of Staff, and she took actions on Henry's internal complaints when Dr. Dubbs, the Chief of Staff, was on leave. [Ryder Decl. at ¶¶ 2, 17.]  However, as previously noted, there is no evidence suggesting that Dr. Ryder performed the verbal counseling at issue here because of one of Henry's protected characteristics.  Even with relation to Henry's subsequent attempt to explain why she was not to blame for almost missing the provider's credentialing, her informal appeal of the verbal counseling was not based upon a claim that she was counseled because of one or more of her protected characteristics. Dr. Ryder, therefore, was not a supervisor who was directly involved the allegedly hostile work environment.

Henry asserts that Amina was directly involved in the creation of the allegedly hostile work environment.  However, although Amina had a GS-11 position and Henry had a GS-9 position, see, e.g., Miyamato Decl., Exh. G (Henry Trans.) at 58-59, and Amina was the Medical Staff Coordinator and the lead Credentialing Officer in the MSO during the period in question, [Amina Decl. at ¶¶ 2, 6,] there is no evidence in the record that Amina had termination, promotion, reassignment, or benefits authority over Henry.  See Reynaga, 847 F.3d at 689 ("A supervisor is a person who can take tangible employment actions against an employee, including effecting 'significant change in employment status, such as hiring, firing, failing to promote,

44

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (quoting Vance v. Ball State Univ., 133 S. Ct. at 2443 (2013))). Thus, Henry's hostile work environment claims are based upon the environment allegedly created by her co-workers.

### B.   Co-workers' Actions

Henry admits that "she and her co-workers did not get along," and she attributes this to the fact that she had a stronger work ethic than they did, and she refused to engage in the unprofessional behavior that they engaged in. [Mem. in Opp. at 5.] It is well-settled that "Title VII . . . does not set forth a general civility code for the American workplace." See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted). A plaintiff cannot prevail on a Title VII claim based on "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing[,]" and "conduct must be extreme to amount to a change in the terms and conditions of employment[.]" Faragher, 524 U.S. at 788 (citations and internal quotation marks omitted).

Even viewing the record in the light most favorable to Henry, many of the incidents that she bases her hostile work environment claims upon involve conduct that is merely uncivil, or a sign of personality conflicts that are unrelated to any

45

protected class.  These include Henry's co-workers: saying
things like Henry is "delusional" and that they do not like her;
[Miyamoto Decl., Exh. G (Henry Trans.) at 43;] whispering about
her; isolating her; making unprofessional remarks in email
messages that Henry received; and bumping Henry's chair without
apologizing.  The only evidence that Henry identifies regarding
the issue of whether this conduct was motivated by any of her
protected characteristics is the fact she "was the only African
American (dark-skinned) female veteran over 50 years old with
anxiety and adjustment disorder disabilities in her office."
[Mem. in Opp. at 4.]  Similarly, the only evidence Henry
identifies to support her allegation that one of her co-workers
tampered with her personal vehicle on two occasions is the fact
that the incident was "discussed" by one of Henry's co-workers
during an office's mediation session.  [Id. at 6.]  Henry does
not state that the co-worker admitted tampering with Henry's
vehicle.

Henry also states her co-workers ignored her requests
that they stop discussing race and color in her presence.  [Id.
at 4-5.]  Henry states: "There were several racial remarks,
mostly negative made in the office about black people and dark-
skinned people . . . .  They even discussed one of the doctors
about how her and her family's skin is so dark."  [Id. at 5.]
According to Henry, Duarte "yelled in [Henry's] direction almost

daily based on race, color, sex, gender, age physical and mental disability protected classes." [Id.]  Although Henry fails to give specific testimony about this alleged harassment, viewing the record as a whole in the light most favorable to Henry, there is sufficient evidence to raise a genuine issue of material fact as to whether her co-workers subjected her to harassment based on the fact that Henry was part of one or more protected classes.

"Where an employee is allegedly harassed by co-workers, the employer may be liable if it knows or should know of the harassment but fails to take steps reasonably calculated to end the harassment."  Dawson v. Entek Int'l, 630 F.3d 928, 937–38 (9th Cir. 2011) (citation and internal quotation marks omitted).  It is undisputed that the PIHCS management was aware of Henry's claims that she was being subjected to harassment in the MSO.

First, after Nakasato observed what she describes as "a breakdown in communication," she implemented the weekly staff "huddles."  [Nakasato Decl. at ¶ 15.]  After Henry made her hostile work environment complaints, a clinical psychologist met with the MSO staff to "talk about different personalities and dynamics, and do various assessments and surveys with staff to help them understand how to work with each other."  [Id. at ¶ 21.]  In addition, a federal mediator was brought in by

47

Dr. Dubbs, and the mediator held sessions with the MSO staff "to help them talk thing [sic] out and better understand where each person is coming from."  [Ryder Decl. at ¶ 17; Nakasato Decl. at ¶ 21.]  Dr. Ryder formed a task force to investigate Henry's claims, and the task force ultimately concluded that Henry's claims were unsubstantiated.  [Ryder Decl. at ¶ 17, Exh. D (6/14/17 Memorandum initiating investigation), Exh. E (Fact Finding Inquiry, dated 8/9/17).]  Even viewing the record in the light most favorable to Henry, she has failed to identify sufficient evidence to create a genuine issue of fact for trial as to the issue of whether her employer failed to take reasonable actions to respond to her reports of about a hostile work environment.

    **C.**   **Ruling**

Plaintiff has failed to raise a genuine issue of material fact as to her discrimination and retaliation claims alleging hostile work environment, and Defendant is entitled to judgment as a matter of law as to those claims.

<strong>CONCLUSION</strong>

For the foregoing reasons, Defendant's Motion for Summary Judgment, filed April 21, 2021, is HEREBY GRANTED. Summary judgment is granted in favor of Defendant as to all of Plaintiff's claims in this case.  There being no remaining

claims, the Clerk's Office is DIRECTED to enter judgment and close this case immediately.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 21, 2021.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**LUCRETIA VELVET HENRY VS. DENIS MCDONOUGH, ETC.;** CV 20-00070 LEK-KJM; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT